# Weber *v.* Short *et al.*

*Bill in Equity for Account and Foreclosure of Mortgages.*

| 55 | 311 |
|----|-----|
| 102 | 311 |

1. *Homestead exemption; rights of widow and children after owner's death.*—The "homestead of a *family*, after the death of the owner thereof," which the constitution declares "shall be exempt from the payment of debts," &c., "in all cases during the minority of the children," enures to the benefit of the widow, as well as of the minor children, but not of the adult children or heirs; and the widow's right to the homestead would continue during her life, if the estate which the husband had should not terminate before that time.

[Weber v. Short et al.]

2. *Same; what estate will support.*—To support a right to a homestead exemption under the constitution, in favor of the widow and children, it is not necessary that the decedent should have been seized in fee of the lands : the right may be claimed in lands held only under a lease, or in an equity of redemption in mortgaged lands; but, in either case, it ceases with the estate. (Overruling *Pizalla v. Campbell*, 46 Ala. 35, as to leasehold lands.)

3. *Same; alienation by mortgage, and foreclosure thereof after husband's death.* When the homestead has been aliened by the owner in his lifetime, by a mortgage duly executed and acknowledged by him and his wife, the mortgage may be foreclosed after his death, notwithstanding the minority of his children ; and in the event of such foreclosure, the children can claim no part of the proceeds of sale until the mortgage debt is paid.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. ADAM C. FELDER.

The original bill in this case was filed by the Alabama Gold Life Insurance Company, against the widow, children, and administrator of Alexander Short, deceased, and also against Julius Weber, and Lloyd Bowers ; and sought an account and foreclosure of three mortgages on a city lot in Mobile, which were executed by said Alexander Short and his wife, on different days, to the said Bowers, Weber, and complainant, respectively. The mortgage to Bowers was executed on the 21st July, 1869 ; that to the complainant on the 3d August, 1871, and that to Weber on the 9th May, 1872 ; and all of them were acknowledged by the said Short and his wife, on or a few days after their respective dates, in the form prescribed by the statute for the acknowledgment of conveyances. Alexander Short died on the 28th May, 1872, intestate, leaving a widow and several minor children ; and he was residing on the mortgaged premises at the time of his death. The bill was filed on the 11th September, 1872. A decree *pro confesso* was taken against the widow, for want of an answer. Bowers and Weber each answered, setting up their respective mortgages, and asking that their answers might be taken as a cross bill, and that their mortgages might be foreclosed. An answer was filed by the guardian *ad litem* of the infant defendants, requiring strict proof of the several mortgages, and of the debts intended to be thereby secured, and asserting a homestead right in the mortgaged lands in favor of the infants ; and he asked that his answer might be taken and held as a cross bill, for the assertion and protection of this right. The several mortgagees, and the administrator of Alexander Short, in answer to this cross bill, admitted that said decedent resided on the mortgaged premises at the time of his death, and that his widow and children had continued to reside there after his death. The cause was submitted for final decree on the original bill, cross bills, answers, decree *pro confesso*, and the exhibits showing the several notes and mort-

[Weber v. Short et al.]

gages. The chancellor held, that the several mortgagees were entitled to a foreclosure of their respective mortgages, but subject to the ' prior homestead right of the infants during their minority ; and he decreed accordingly, ordering an account of the mortgage debts. On the coming in of the register's report, which was confirmed without objection, the chancellor decreed a sale of the mortgaged premises, and directed the register to retain $2,000 of the proceeds of sale, and to invest the same in other property as a homestead for the infants. The defendant Weber appeals from this decree, and here assigns it as error ; and the Gold Life Insurance Company makes a separate assignment of errors, the same in substance.

Geo. N. Stewart, for appellant Weber.—The mortgages were properly executed and acknowledged to pass the homestead. The acknowledgment was made before a proper officer, and is in proper form ; it recites that the wife voluntarily executed the deed, with knowledge of its contents ; and this certificate, if not conclusive, is certainly presumptive evidence of the wife's assent. The decedent, then, had no homestead exemption at the time of his death : he and his wife had parted with it, for full value. The widow admits the alienation, and makes no claim of a homestead ; and the children can make none, as their father had none at his death. Only an equity of redemption descended to them, and it was worthless ; and if they can claim any homestead at all in the premises, it is only after the mortgage debts have been paid in full.

Wm. Boyles, for the Gold Life Insurance Company.—(No brief on file.)

L. H. Faith, for the infant appellees.—1. The mortgages were not a valid alienation of the homestead, as against the infant defendants. The decree pro confesso against the widow was not evidence against them.—Rev. Code, § 3391. The certificate of the notary, before whom the acknowledgment was made, does not go far enough—it does not show that the wife "voluntarily assented" to the deed. In the construction of a statute requiring such assent, the certificate would not show a compliance.—Boykin v. Rains, 28 Ala. 339. It is submitted that, in the absence of an express statute, the ordinary certificate of acknowledgment is not sufficient to show a compliance with the constitutional requisition. It was evidently the intention of the framers of the constitution to place greater restrictions around the aliena-

[Weber v. Short et al.]

tion of homesteads than are required in the case of ordinary conveyances. If Mrs. Short did "voluntarily assent" to the mortgages, that fact should have been proved by her deposition, or by the deposition of the notary. The certificate only shows a relinquishment of dower.

2. But, even if the mortgages were properly executed and acknowledged to pass the homestead right of the mortgagor, the right of the children to a homestead, during their minority, is prior to the claim of the mortgagees. The constitution declares, that "the homestead of a family, after the death of the owner thereof, shall be exempt from the payment of any debts contracted after the adoption of this constitution, *in all cases*, during the minority of the children." Here were debts contracted after the adoption of the constitution, and the family residing on the homestead after the owner's death. To give the mortgages priority over their right to a homestead during their minority, would restrict the constitutional exemption to general debts, or unsecured debts; and would, in many cases, deprive the children of a homestead when they most needed it. A mortgage is only a charge on lands, and an incident to the secured debt; while the title, estate, and possession, with all their incidents, remain in the mortgagor.—*In re Casey*, 8 Bank. R. 71; Southern Law Review, January, 1874, p. 162. An equity of redemption is subject to levy and sale under execution (Rev. Code, § 2871), and a homestead may be claimed in it.—*In re Volger*, 8 Bank. R. 132.

MANNING, J.—Alexander Short, of Mobile, and his wife, executed at different times three several mortgages, duly acknowledged and recorded, of the lot and houses thereon in which they lived, and the title to which was in him, to secure payment of three several debts to creditors of said Alexander. The mortgages were all made after the constitution of 1867-8 was put in force, and the mortgagor, Alexander, died in May, 1872, leaving surviving him his wife, the said Virginia, and three minor children. Against these, and two of the mortgagees, the other mortgagee filed a bill for the ascertainment of the amounts due to the creditors respectively, and for a sale of the property to pay them. The widow made no defense, and a decree *pro confesso* was rendered against her. For the minors, their guardian *ad litem* claimed a homestead right in their favor; and the property having been sold, under a decree of the chancellor, for a sum less than the amount of all the debts, he ordered $2,000 of the proceeds to be withheld from the mortgagees, and invested in other property for a homestead of that value.

The questions presented for revision arose under article XIV of the constitution referred to, relating to "Exempted property.." The sections to be construed are as follows:

"§ 2. Every homestead, not exceeding eighty acres of land, and the dwelling and appurtenances thereon, to be selected by the owner thereof, and not in any town, city, or village, or, in lieu thereof, at the option of the owner, any lot in the city, town, or village, with the dwelling and appurtenances thereon, owned and occupied by any resident of this State, and not exceeding the value of two thousand dollars, shall be exempted from sale on execution, or any other final process from a court, for any debt contracted after the adoption of this constitution. Such exemption, however, shall not extend to any mortgage lawfully obtained; but such mortgage, or other alienation of such homestead, by the owner thereof, if a married man, shall not be valid, without the voluntary signature and assent of the wife to the same.

"§ 3. The homestead of a family, after the death of the owner thereof, shall be exempt from the payment of any debts contracted after the adoption of this constitution, in all cases, during the minority of the children.

"§ 5. If the owner of a homestead die, leaving a widow, but no children, the same shall be exempt, and the rents and profits thereof shall enure to her benefit."

These sections, with the same numbers, are retained in article X of the constitution of 1875, modified, however, by a provision which does not affect the case now before us. The policy which is the subject of these constitutional provisions has been adopted in this country at a recent date, but is already established in many of the States. It encountered violent opposition, and has been vindicated with a zealous advocacy. Hence, we can plainly see in the judicial discussions that have arisen out of it, and in the decisions made by the courts, the influence of contrariant prepossessions. The want of harmony in the adjudications it has produced, causes much embarrassment, and can be corrected only by time and legislation.

The clauses above copied from our constitution, it may be difficult to construe, so as to obviate every plausible objection. In the language of them, there is a lack of the precision and fullness requisite to make the meaning clear in its application to each of the great variety of cases to which they may seem to relate. But we must endeavor so to interpret the several sections concerning the subject, as to make the policy of which each outlines a part consistent as a whole. And this we should frankly accept, and carry into

[Weber v. Short et al.]

operation, according to the intention of the people in adopting it, so far as we are enabled by the language employed to ascertain and give effect to such intention. In doing this, however, we are not at liberty to stretch words and expressions beyond their legitimate meaning, or to disregard limitations that are written on the face of the constitution. What are the main features, the substance, rather, of the policy under consideration?

In this State, and in the country generally, it was, until recent times, a well established rule, that all of a person's property should be subject to the discharge of his debts—that what he lawfully contracted to pay must be paid, though wife and children be deprived of every comfort. Even this was a mitigation of the severity of a former period, which added imprisonment in jail if the debt was not discharged. The law was so rigorous as to produce not only distress, but, in popular opinion, great evil, also, by impairing the efficiency, and discouraging the exertions, of those who were engaged in the various pursuits that promote the welfare of a community. Hence, a change was introduced, which, in the language of the Supreme Court of Michigan, has "a deeper meaning than a mere purpose to secure a present shelter for the husband and wife. It looks to the needs of the social state, as connected with the public welfare, and aims to promote and secure the integrity and unity of those little commonwealths known as families; not merely for the benefit of the members considered as individuals, but with a view to the general good, as found to be measurably bound up with the well-being of these domestic establishments."— *Comstock v. Comstock*, 27 Mich. 101.

But, it was not considered that "the general good," in this busy age and country, required that families should be tied down to particular portions of the earth's surface—become *adscripti glebæ*—or that the most valuable property of the country should, under the constraint of a rigid system, be made inalienable, so that the owner of a homestead could not, in any exigency, or by any means, charge a debt upon it, notwithstanding he might be thereby enabled to make his skill and labor available and productive to the greater advantage of himself and his family. The idea was strong, on the one hand, that the property a man owned he should have the right to dispose of; and on the other, that the State ought not to send its officers, on behalf of his general creditors, to take away for their benefit the home in which their debtor sheltered and supported his wife and children, or rested and refreshed himself to strengthen him for his daily work. While, therefore, the fundamental law forbade this to ·

be done, without the previous act of the owner authorizing it in a manner which it prescribed, it permitted him, as such owner, and as the natural and most trustworthy guardian of his household, to sell or mortgage his homestead; requiring only, if he was a married man, that his wife should signify her approval of the transaction, by also signing and assenting to the instrument.

But, the property belonging to a man's homestead might be of large extent and value. It was not the intention of the State to secure to him or his family the means of living in opulence, or in ease, at the expense of his creditors. It is presumed that he who does not pay his debts is poor, and it is only a homestead of moderate extent or value, adapted to a family in that condition, which the constitution makes sacred against invasion by creditors. Therefore, that instrument, in the section first above recited, defines the extent or value of the homestead which it intends to protect, as well as the manner in which it may be aliened or mortgaged. And it was the homestead thus prescribed, with the power of the owner over it so declared, which is referred to in the other sections above cited of the same article in the constitution. If the homestead be of greater extent than eighty acres, or of greater value than $2,000, all beyond was left by the constitution subject to be proceeded against, as authorized by the legislature, for the payment of the owner's debts ; and with that extent or value, the homestead was made subject to be alienated or mortgaged by him, or by him and his wife. By statute, the homestead right now is extended to a tract of one hundred and sixty acres situated in the country.

But section 2, while prescribing what shall be the extent of the homestead which the constitution provides for, declares also that it shall be exempt—that is, while it is the homestead of the owner—from sale under execution, or any other final process from a court, for any debt of his contracted after the adoption of the constitution. It says nothing of what shall be done with it, or become of it, when, by reason of the owner's death, it ceases to be his homestead. In this section 2, the homestead is spoken of only as *his*. If, therefore, he die, without leaving wife or children, and his estate in the homestead is a fee simple, it must, like his other real estate, being released from the homestead right, descend or go to his heirs or devisees, subject to the payment of his debts, according to the law of descent.—Rev. Code, § 1888. But what shall be done with it, if he leave wife and minor children, or either, surviving him? Provision was intended to be made for these cases, in sections 3 and 5. By the former it is enacted, that "the homestead of a family, after

the death of the owner thereof, shall be exempt from the payment of any debts contracted after the adoption of this constitution, in all cases during the minority of the children." But, though exempted from the payment of debts, the constitution does not declare to whom it shall go. Suppose there be adult children, or heirs, having homes of their own, as well as minors : is the homestead preserved for the former, as well as the latter ? and was it for this exonerated from liability to the claims of creditors ? Suppose the deceased leave a widow also, and minor children : does the widow take any interest in the homestead ?

The constitution does not, in terms, answer either of these questions. But, noticing the change in the phraseology, and that in section 3 the homestead is spoken of as that of the *family*, instead of as that of the owner, it must be held, that the exemption is for the benefit of the family, and not of the adult heirs, and for the benefit of the widow as a part of the family. And construing this section in connection with section 5 *(supra)*, we are of opinion, that the widow's right to the homestead would continue during her life, if the estate which her husband had in the homestead property should continue so long. But, whether there be a widow or not, and, if there be, whether she live long, or die soon, the homestead shall be exempt "in all cases during the minority of the children." And it was probably in contemplation of such contingencies, and of the possible claims of adult heirs, or of devisees, that the clause, "in all cases during the minority of the children," was added to section 3.

2. Let us next inquire, what title the owner of a homestead must have in the property composing it, and how it may affect the duration of the homestead right. In *Pizzala v. Campbell* (46 Ala. 35), our predecessors held, that a homestead right could not exist in a lease-hold estate—property held by lease. They were of opinion, that the interest of the widow (who was a party to that cause) must be a life estate in the homestead—a freehold ; and that it, therefore, could not be supported by an estate less than a freehold. But this unnecessarily limits the benefit of the law, to the disadvantage of the needy persons for whose comfort it was enacted. Why should the widow be turned out from the shelter of a home, immediately after her husband's death, only because, the estate being a leasehold, she might not be able to occupy it during her whole life ? If the doctrine be correct in reference to a lease for a short term, it would be so in respect to one for thirty, or fifty, or ninety-nine years ; and this, although the rent may have been paid in advance, or be only a peppercorn, payable annually. It seems to us, that the reason of

the law, and the purpose to provide for persons in a neces-
sitous condition, which inspired the adoption of it, were lost
sight of in the formation of the opinion in that case; and
we are unable to yield it our assent.

In several other States, decisions directly contrary have
been made. "A homestead right," says Smyth in his work
on Homestead and Exemption, "may exist in lands which
are held by a less estate than a fee simple; in fact, it may
exist where a person has no estate whatever, but a mere
naked possession. The homestead right does not depend
upon the character of the title held by the party claiming
it: it is impressed on the land, to the extent of the interest
of the claimant in it; not on the title merely."—§ 114. In
*Spencer v. Geissman* (37 Cal. 96), it was held, that "a party
having a naked possession only of land, the title being in a
stranger, may acquire a homestead right thereto, as to every
body but the owner." And in *Brooks v. Hyde* (Ib. 367), the
same court said, of persons wrongfully in possession of land:
"By a dedication to homestead use, they, of course, acquire
no title to the land, which they did not have before, and no
additional protection against the claim of the true owner;
but, as against their creditors, the possession of the land is
as much protected by the homestead law, as if they had a
fee simple."

These citations are made, only to show the view courts
have taken of the nature of what is called the homestead
right. We refer to another decision which has our unquali-
fied approval: It is that made in *Blue v. Blue* (38 Ill. 10),
in which it was maintained, that "one who holds the equi-
table title to land, under a contract of purchase, is the owner
thereof within the meaning of the homestead law; he holds
that character of estate to which a homestead right may
attach, and which will be protected from levy and sale as
against third persons. Whether the debtor holds in fee
simple, for life, or for a term of years, the reasons for afford-
ing the exemption apply with equal force." The law, doubt-
less, intends, if the estate which the owner of a homestead
had was an estate in fee simple, that his widow's right to the
homestead shall continue during her life; but there does not
seem to be any good reason for not also holding, that if the
estate does not endure so long, the widow's homestead right
shall continue while the estate lasts.

What, now, was the right, if any, which the family of Alex-
ander Short took in the homestead, when he died? He and
his wife mortgaged it in the manner authorized by the law
then in force. We have no doubt of the validity of the mort-
gages, and that they were sufficiently proved. By them, his

estate in the property was reduced to an equity of redemption. The legal title passed from him, and could be regained only by payment of the mortgage debts. He stood, in relation to the title, in the situation of one who has contracted for the purchase of real estate upon credit, and for the right to take possession of and occupy it, with his family, under a stipulation that he should receive a conveyance of it only upon payment of the purchase-money. In one case, there is (as in *Blue v. Blue, supra*) a right or equity to purchase; in the other, a right or equity to repurchase, or redeem. Mr. Short's homestead was of property in which he had only such a right. If he, or his representatives, had made, or should make, the stipulated payments to the mortgagees, the homestead right, if any, would have been or would be enlarged by the consequent defeasance of the titles of the latter. Otherwise, it must cease, when the right by which it was held is overthrown by the superior titles outstanding in the mortgagees.

The idea of the chancellor seems to have been, that the mortgages having been executed during Mr. Short's life, if not foreclosed, ceased to be valid when he died—that they could operate only against *his* homestead right, and during his life. Says the chancellor: "If Mrs. Short is left in the possession of the homestead till the death of her husband, either in connection with him, or singly, then　*　*　the constitution endows her with the right to the homestead by a different rule; and having signed the mortgage, or other alienation, for another and a different purpose, such signature and assent will not deprive her of the right, or estop her from setting up the right, in the new relation into which she has entered by the death of her husband, as his widow." We can not perceive in the constitution any intention thus to defeat the title by mortgage, which it expressly authorized to be created; and we think it inconsistent with the manifest purpose of the article under consideration, to hold that a security which it declares may be made, shall be so ephemeral or infirm.

3. It has been suggested, also, that although not made void, yet, under section three, the mortgages can not be foreclosed after the death of Mr. Short, "during the minority of the children." What is said above is applicable to this idea also. And we may add, that if this view be accepted as correct, the lending of money upon bond, or note, and mortgage of real estate, must almost cease, and the sale of such property upon credit, for a part of the price, become a rare transaction. For who can know how soon the mortgagor or purchaser may die, and how long his widow may not survive,

[Weber v. Short et al.]

or the "minority of the children" continue? Mortgagees, moreover, would be compelled promptly, and often oppressively, to have their mortgages foreclosed, when their own feelings, and the interests of the mortgagor's family, might otherwise incline them to be indulgent. Indeed, it is difficult to foresee the embarrassment and distress that would result from the maintenance of such a doctrine.

The constitutional clauses under consideration, be it observed, exempt the homestead from liability for debts only—for the demands of creditors as such—and intercept the descent to heirs or devisees, in favor of the widow, or minor children, or the family. They do not undertake or profess to secure it against the claims of persons having a superior title to that of the occupiers of the homestead, whether such title be wholly independent of, and paramount to that of the claimant of the homestead, or be that of his lessor, or of his vendor, who has retained the title as a security for the payment of the purchase-money; or of a mortgagee, who holds it as a security for the payment of a debt. That a debt exists, collateral to the title, and for which it is held as a security, does not prevent the holder from availing himself of that title, if it be valid, either in an action of ejectment, or in a suit in equity to carry it into effect. Power to make a mortgage being expressly conceded by a constitutional provision, we can not hold that the mortgage shall be invalidated, either permanently or for a time, by construction of a phrase of doubtful meaning, in a subsequent paragraph.

It results from the views we have expressed, that, independently of any other objection to it, the homestead right of the widow and children of Mr. Short, being in property wherein he had only an equity of redemption, and being dependent for continuance on the extinguishment of these duly executed mortgages, must yield to the rights of the mortgagees, and that the chancellor erred in withholding from the latter $2,000 of the proceeds of the sale, to be applied to the purchase of another home.

If there had been a surplus after the mortgages were satisfied, out of that it might have been correct, under a subsequent statute on the subject, to reserve a sum not exceeding that mentioned above, for the benefit of the family of Mr. Short, against the claims of creditors, if there are any, who became such after the adoption of the statute.

So much of the decree of the chancellor as authorizes the withholding of $2,000 of the proceeds of sale of the homestead from the mortgagees, for the benefit of the children, or wife and children of Mr. Short, must be reversed and set aside, and the cause remanded.